**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

KAY LANDERS,

      Plaintiff,

v.

PIKE COUNTY, GEORGIA,

      Defendant.

Civil Action No.:

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW, Plaintiff Kay Landers, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff alleges that Defendant Pike County, Georgia subjected Plaintiff to discrimination based on sex, resulting in the termination of Plaintiff's employment, and retaliation as a result of Plaintiff's participation in protected activities, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of Title VII of the Civil Rights Act.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Zebulon, Pike County, Georgia, which is located within this judicial district.

**PARTIES**

3.

Plaintiff Kay Landers (hereinafter, "Plaintiff" or "Landers") is a citizen of the United States and a resident of Georgia. At all times relevant to this suit, Ms. Landers was employed with Defendant Pike County, Georgia

4.

At all relevant times, Ms. Landers was considered a covered, non-exempt employee under all laws referenced herein.

5.

Defendant Pike County, Georgia (hereinafter, "Defendant") is a county government organized under the Constitution and laws of the State of Georgia. Defendant may be served with process through a majority of its Commissioners, pursuant to O.C.G.A. § 36-1-5, or through the chair of its Board of Commissioners, pursuant to O.C.G.A. § 9-11-4(e)(5).

6.

Defendant has employed in excess of 15 employees, working for at least 20 calendar weeks, in 2021 and preceding years.

7.

Defendant is a covered employer within the meaning of Title VII of the Civil Rights Act.

## STATEMENT OF FACTS

8.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 7, as if the same were set forth herein.

9.

Ms. Landers was employed with Defendant on several different occasions over the last ten years, and she most recently served as Defendant's Financial Administrative Supervisor.

10.

Defendant is government employer in a relatively small county with a population of around 18,000 residents, located just south of Metro Atlanta, and Defendant has employed in excess of 15 individuals in 2021 and in prior calendar years.

11.

In June 2020, while Defendant was in the midst of preparing its annual budget, it invited Ms. Landers to return to her position, explicitly citing Ms. Lander's expertise and knowledge concerning Defendant's finances.

12.

As evidenced by Defendant's reemployment, as well as her performance upon her return, Ms. Landers' performance during her tenure with Defendant was always exemplary.

13.

Prior to the events at issue in this litigation, Ms. Landers had already experienced some discrimination based on sex while employed with Defendant.

14.

By way of example, Defendant generally prefers for its elected officials, officers, and employees to be men with a dominant personality.  However, Defendant takes issue when its female employees express behaviors that Defendant considers as being assertive.  Ms. Landers recognized that she was not the most liked employee, but that was solely because she was sometimes known for being forthright or blunt in her communication style.

15.

Moreover, while Ms. Landers never had any desire to become the county manager, she was told by an individual previously serving in that position that the county would not only refrain from choosing a female for that position, that it certainly would not be Ms. Landers because of her straightforward demeanor, which she understood to mean was a characteristic inconsistent with how Defendant expected its female employees to behave.

16.

When Ms. Landers previously applied for the head of Defendant's Planning & Zoning Department, Defendant offered the position to a less qualified male candidate.

17.

Moreover, Ms. Landers had seen numerous female coworkers resign from their employment with Defendant over time after having been subjected to similar treatment as Ms. Landers..

18.

Around three days after Ms. Landers returned to work for Defendant in 2020, Defendant appointed Brandon Rogers as its County Manager (hereinafter, "County Mgr. Rogers").  Ms. Landers, who was already familiar with him, had observed

County Mgr. Rogers become angry and offended when Defendant's female employees in particular, like Ms. Landers, demonstrated greater expertise in particular areas (e.g., finance or human resources) than County Mgr. Rogers.

19.

While Defendant is governed by a Board of Commissioners, that body and its individual commissioners are not supposed to be involved with the day-to-day operations of the County, including with regard to human resources functions. Defendant's county manager is supposed to be the one responsible for such duties.

20.

On or about April 14, 2021, an individual made a post on Facebook that led to the events underlying this litigation. A true and correct copy of said post is provided below:



21.

As Ms. Landers has always maintained, she was not involved in the creation

of this post, or its attached content, nor did she post this information on Facebook or

anywhere else for that matter.

22.

Instead, the person making said post may have been doing so under the

assumed or fake identity, "Jake Pike," whose profile picture appears  to show a

person who is male, was apparently questioning the Chair of the County

Commission for the location in which he had been parking his personal vehicle,

writing:

> Why does our Commission Chairman hide his truck at the sheriffs [sic]
> department and slink over to the Commission offices? Who's he hiding
> from? Why the cloak and dagger? Briar Johnson.

The post also includes a photograph of what appears to be vehicles in a parking lot,

with a red circle and arrow pointed toward a vehicle or several vehicles therein.

23.

On April 16, 2021, Chairman Briar Johnson (hereinafter, "Chairman

Johnson") and County Mgr. Rogers abruptly called Ms. Landers into a meeting and

interrogated her about her involvement in the Facebook post.

24.

As Ms. Landers responded during the April 16, 2021 meeting, and as she continues to maintain, Ms. Landers did not participate in making the post.  However, the men questioning Ms. Landers said that they had pulled security camera footage and could see an unidentifiable woman who appeared to take the photo that would supposedly later be included in the post.

25.

When Chairman Johnson and County Manager Rogers questioned whether Ms. Landers was the woman in the footage, Ms. Landers adamantly denied that it was her.

26.

Upon subsequent review of the video recordings, it was impossible to ascertain the identity of the person in the video, and the only characteristics that are remotely identifiable are that such person appears to be a white female with light hair. A true and correct copy of a screenshot of said video is attached hereto. (Doc. 1-3.)

27.

Moreover, Defendant did not have any other reason to believe that Ms. Landers was the person in the video other than the fact that she also happens to be female.

28.

In addition to Ms. Landers, Defendant also targeted another female employee, its Human Resources Specialist, Kelly Wall. Chairman Johnson and County Mgr. Rogers placed Ms. Wall into a separate room from Ms. Landers, and over the course of several hours, the men went back-and-forth between the small rooms, questioning both Ms. Landers and Ms. Wall about the Facebook post.

29.

Like Ms. Landers, Defendant also targeted Ms. Wall simply and solely because she was a woman.

30.

Defendant did not question any of its employees who are male about their involvement in the Facebook post or taking the picture that was attached.

31.

In addition to uncomfortable feeling arising out of being the only woman trapped in a small room with the two men, Chairman Johnson made a comment

during their conversation that gave Ms. Landers pause.  Specifically, he told Ms. Landers that she had made County Mgr. Rogers "mad," and when that becomes the case "bad things happen."

32.

Even after hearing Chairman Johnson's comment, and having been asked again to confirm she had been the woman in the video taking the picture, Ms. Landers again denied taking the photograph at issue.

33.

It was only after this point that Chairman Johnson and County Mgr. Rogers showed a copy of the recording of the video surveillance to Ms. Landers.  After Ms. Landers began reviewing the video and she noted that she could not tell who the individual therein was due to the poor quality of the video and distance the person was from the camera, Defendant then played the video on a laptop in hopes that it would be easier to see.

34.

Ms. Landers continued to adamantly deny that she was the person in the video or had any involvement in the Facebook post at issue.

35.

At the end of the hours-long interrogation, County Mgr. Rogers told Ms. Landers that she would be suspended for three days while Defendant further investigated the incident.

36.

Defendant had previously stated that it was going to investigate the email associated with the Facebook profile and attempt to ascertain the IP address of the device that made the post.

37.

When County Mgr. Rogers advised Ms. Landers of her three-day suspension, he also told her that if nothing changed concerning Defendant's investigation, Ms. Landers would be fired.

38.

After the interrogation, Defendant sent Ms. Landers home to begin her suspension.

39.

In the time that Ms. Landers was suspended, Defendant did not attempt to ascertain the email address associated with the account that made the Facebook post, nor did it try to determine the IP address for the device that made the Facebook post.

40.

Similarly, Defendant did not question any other individuals about the incident during Ms. Landers' suspension.

41.

Had Defendant found the email address associated with the Facebook account or the IP address for the device making the post, Defendant should have concluded that Ms. Landers did not make or submit the Facebook post at issue.

42.

Defendant then contacted Ms. Landers and asked her to come into work to meet for the purpose of discussing her termination, which Defendant would do on April 21, 2021.

43.

When Ms. Landers was asked during the termination meeting if she had anything else to say, Ms. Landers declined based on what happened during her April 16, 2021 conversation, and because Ms. Landers already expected to be terminated based on the prior discussion, and she knew that her termination had nothing to do work her work or her stellar performance while employed.

44.

According to the termination letter that Defendant provided to Ms. Landers, she terminated because of her refusal to admit that she was the woman in the video recording who may or may not have been captured taking a picture. Additionally, County Mgr. Rogers cited Ms. Landers' purported violation of County Policy 36.34, a violation of which he said resulted in a negative Facebook post directed Chairman Johnson.

45.

Even assuming *arguendo* that Ms. Landers had been the woman who appeared in the video apparently taking a picture, it cannot be said that she violated Defendant's Personnel Policy § 36.34. According to such policy:

> It is the policy of this County that the internal affairs of Pike County, particularly confidential information, represent a public trust that each employee has a continuing obligation to protect. Information designated as confidential, including but not limited to investigation, legal matters, etc., is to be discussed with no one outside the organization and only discussed within the organization on a "need to know" basis. In addition, employees have a responsibility to avoid unnecessary disclosure of non-confidential information about the County, its employees, its citizens, and its suppliers. This responsibility is not intended to impede normal business communications and relationships, but it is intended to alert employees to their obligation to use discretion to safeguard internal County affairs. Employees violating the intent of this policy will be subject to discipline, up to and including termination.

46.

The Facebook post at issue does not contain any information that was or that should have been designated as confidential – it is merely a question as to the location in which a County official parked his personal vehicle.  This is information that should have been produced in a response to a request under the Georgia Open Records Act, and it would not have been subject to any of its exemptions.  Moreover, Chairman Johnson could not have any expectation of privacy in the information contained in the Facebook post since his vehicle was parked in a public place.

47.

According to Defendant's Personnel Policy § 36.20(c)(4), Defendant was required to provide any employee charged with misconduct that was considered just cause for dismissal prior to a three (3) day suspension.

48.

As alleged herein, Ms. Landers was suspended for three days before she was called in to be terminated, and as a result, Defendant technically complied with its Personnel Policy § 36.20(c)(4).

49.

However, Defendant failed to adhere to the same section of its Personnel Policies by providing "[a] written statement specifically setting forth the reasons for

suspension with a recommendation for dismissal … within one (1) working day of the effective action." Defendant failed to provide Ms. Landers or its Human Resources Administrator with such written statement prior to her suspension.

50.

Defendant also failed to provide Ms. Landers with the "Pre-Termination Hearing," as required under Personnel Policy § 36.19.

51.

According to Personnel Policy § 36.20, within three days of an employee being notified of the charges against them, Defendant's Human Resources Administrator is supposed to hold a conference in which the employee may present evidence related to the accusations.

52.

Defendant violated its Personnel Policy § 36.20 by failing to hold such a conference with Ms. Landers within three days of when she was notified of the charges against her.

53.

According to Personnel Policy § 36.20, Defendant's Appeals Committee is supposed to render a decision on a proposal for dismissal, after review of the relevant information.

54.

Defendant's Appeals Committee did not receive any relevant information concerning Ms. Landers' impending termination; nor, did such Committee render any decision concerning Ms. Landers' termination.

55.

The same Personnel Policy requires Defendant's Human Resources Administrator to advise the employee being dismissed of her right to appeal, and such employee is supposed to receive written notification of her internal right to appeal.

56.

Defendant did not advise Ms. Landers, in writing or otherwise, of her right to appeal.

57.

Regardless, on April 29, 2021, Ms. Landers, through counsel sent correspondence intended as notification of Ms. Landers' claims, as well as to advise Defendant that it failed to follow its own policies, demand her reinstatement, and request an appeal if all other relief were refused.

58.

Critically, in the same correspondence, Ms. Landers' advised Defendant of her contention that terminating her employment solely because a female appeared to be taking a picture in a video, and then using solely that information to terminate Ms. Landers because she is also female, was discrimination based on sex in violation of Title VII of the Civil Rights Act. (Ex. D at 2.)

59.

As a result, Defendant's Board of Commissioners was aware that Ms. Landers was not only requesting that she be provided with an appeal, but that she was alleging that she had been discriminated against and was considering pursuing a charge of discrimination for discrimination based on sex.

60.

During its May 12, 2021 meeting of the Board of Commissioners, the County Manager requested that the agenda be amended so as to discuss Ms. Landers' potential claims in Executive Session. For nearly 45 minutes, the Commissioners discussed Ms. Landers claims and what they should do in response.

61.

Regardless of what the Board of Commissioners discussed during this Executive Session, County Mgr. Rogers still took matters into his own hands.  Ms.

Landers submitted an application for an open position reporting to the Chief Financial Officer of the Lamar County Board of Education. Having received approximately 53 applications, Ms. Landers was one of ten people who were invited to an interview on May 7, 2021, and she was the only candidate who had experience with the software used by this prospective employer. On May 17, 2021, Ms. Landers *and only one other candidate* were selected for a second and final interview. After the interview, Ms. Landers has reason to believe that the only reference or prior employer that this prospective employer contacted was Defendant. Specifically, on May 19, 2021, the Lamar County Board of Education spoke with County Mgr. Rogers about Ms. Landers' application – and within two hours of this telephone call, the Lamar County School Board advised Ms. Landers that she was no longer in consideration for the position.

62.

Similarly, upon information and belief, it appears that County Mgr. Rogers and Defendant had some involvement in the reasons that some of Ms. Landers' 24 other applications for employment were denied.

63.

After Ms. Landers explicitly requested an appeal, she and Defendant, both through counsel, spent several months discussing different aspects of and clarifications concerning the appeal.

64.

While Defendant ultimately said that it would allow Ms. Landers the appeal she requested, when Ms. Landers' counsel sought to clarify whether Ms. Landers would be reinstated to her position in the event that she prevailed in her appeal, Defendant's responded:

> Good morning and thank you for your recent email.
>
> I am not in position to say what the Board of Commissioners would do in the event Ms. Landers were to prevail in the appeal process. I can reiterate what I believe has already been conveyed and that is the County Manager is not interested in Ms. Landers returning to work for Pike County.
>
> Please keep me advised regarding your client's position/intentions.
>
> Thanks.
>
> Yours truly,

65.

Given that it was quite apparent to Ms. Landers that reinstatement would not be a possibility, even if she had won the appeal, Ms. Landers decided to forego such a fruitless endeavor.

66.

However, unlike Ms. Landers, Defendant is allowing County Mgr. Rogers to appear before Defendant's Appeal Committee, prior to taking disciplinary action based on a grievance filed against for creating a hostile work environment, and that hearing is scheduled for May 2, 2023.

Procedural/Administrative Background

67.

On or about October 11, 2021, Ms. Landers submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she had been subjected to discrimination based on sex and retaliation for her participation in protected activities. The EEOC assigned Ms. Landers Charge Number 410-2022-00262.

68.

Defendant had actual notice of the EEOC Charge, participated in the administrative proceedings and investigation, and was represented by counsel at that time.

69.

Upon Ms. Landers' request that the EEOC then forwarded, the Department of Justice subsequently issued a Notice of Right to Sue, which Ms. Landers received through counsel on January 31, 2023.

70.

Ms. Landers has exhausted her administrative remedies as to her Charge of Discrimination and she is filing the instant action within ninety days of the EEOC's issuance, as well as Ms. Landers's receipt, of the Notice of Right to Sue.

**COUNT I:**
**DISCRIMINATION BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

71.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 70, as if the same were set forth herein.

72.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's sex.  42 U.S.C. § 2000e-2(a).

73.

In order to prevail in a Title VII discrimination case, the plaintiff must first establish a *prima facie* case showing that: (1) she is part of a protected class; (2) she experienced an adverse employment action; (3) she was qualified for the job at issue; and (4) "her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019).

74.

If the plaintiff establishes "a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id*. at 1221 (citation omitted).

75.

If the defendant carries its burden, the plaintiff must show that the defendant's "proffered reason was merely a pretext for unlawful discrimination." *Id*. (citation omitted).

76.

"[Title VII] prohibits employers from taking certain actions "because of" sex. And, as this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'" *Bostock v. Clayton Cnty., Ga*., 140 S. Ct. 1731, 1739-40 (2020) (citation and quotation omitted). "That form of causation is

established whenever a particular outcome would not have happened "but for" the purported cause." *Id.* As the Supreme Court reasoned after analyzing the relevant authority, "...taken together, an employer who intentionally treats a person worse because of sex - such as by firing the person for actions or attributes it would tolerate in an individual of another sex - discriminates against that person in violation of Title VII." *Id.*

77.

Plaintiff is considered in a protected class as her sex is female.

78.

As alleged herein, Plaintiff was qualified for the position that she held with Defendant and her performance was exemplary at all times.

79.

As alleged herein, on April 16, 2021, Defendant suspended Plaintiff for a period of three days, and then subsequently terminated Plaintiff's employment.

80.

The reasons that Defendant issued said suspension had nothing to do with Plaintiff's employment, her performance, or her conduct.

81.

Instead, Defendant suspended and then terminated Plaintiff because she is female and/or because of Defendant's unfounded belief that Plaintiff was the woman appearing in a certain video surveillance recording.

82.

As alleged herein, Plaintiff was treated less favorably than her coworkers who were not female. Specifically, Defendant did not subject any of its male employees to an interrogation as to whether they appeared in the video and/or were responsible for the post on Facebook, and as a result, Defendant did not subject any non-female employees to interrogation, suspension, or termination as a result.

83.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for suspending and the terminating Plaintiff's employment for reasons unrelated to her conduct and performance and otherwise treating Plaintiff less favorably than her similarly situated counterparts.

84.

More specifically, Defendant will be unable to establish that Plaintiff was the woman appearing in the video at issue or that Plaintiff was involved in the Facebook post at issue.

85.

Even if Plaintiff had been the woman appearing in the video, that would not necessarily mean that she was responsible for taking the picture that was attached to the Facebook post.

86.

Even if Plaintiff had been the woman in the video and she had taken the picture that was attached to the Facebook post, that would not necessarily mean that she was responsible for posting this content on Facebook.

87.

Even if Plaintiff had been the woman in the video, that she had taken the picture that was attached to the Facebook post, and Plaintiff was somehow involved in creating or posting the Facebook post at issue, this still would not have been a legitimate reason to terminate Plaintiff's employment under Defendant's Personnel Policies.

88.

Plaintiff will prove that the Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's sex.

89.

Plaintiff has been injured by Defendant's discrimination against her based on sex, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the amount of not less than $300,000.00, or other amount provided by statute, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**RETALIATION**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

90.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 70, as if the same were set forth herein.

91.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against or harass any of its employees because an employee has opposed any practice made an unlawful by Title VII.  42 U.S.C. § 2000e-3(a).

92.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively. *See* 42 U.S.C. §§ 2000e & 2000e-1.

93.

As alleged herein, Plaintiff engaged in activities protected by Title VII by objecting to Defendant's discrimination of Plaintiff based on her sex and by advising Defendant of Plaintiff's intent to file a charge of discrimination in correspondence that she sent to Defendant on or about April 29, 2021.

94.

As alleged herein, as a direct result of Plaintiff's April 29, 2021 correspondence, Defendant subsequently made statements to, at least, one prospective employer that resulted in the third-party to withdraw its consideration of Plaintiff's application for prospective employment.

95.

As alleged herein, as a direct result of Plaintiff's April 29, 2021 correspondence, Defendant advised Plaintiff that it refused to reinstate Plaintiff into her position even if she were to prevail in her internal appeal.

96.

Plaintiff has been injured by Defendant's retaliation against her based on her participation in protected activities, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the amount of not less than $300,000.00, or other amount provided by statute, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kay Landers respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant Pike County, Georgia, and that said Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for discrimination based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

4)    That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for retaliation for Plaintiff's participation in protected activities, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act; and,

5)    For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 1st day of May, 2023.

KENNETH E. BARTON III
Georgia Bar No. 301171
*Attorney for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com